United States District Court
Southern District of Texas
**ENTERED**
March 04, 2024
Nathan Ochsner, Clerk

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| Melissa Coffee,<br>*Plaintiff,* | § | |
| | § | |
| | § | |
| v. | § | Civil Action H-22-310 |
| | § | |
| Martin O'Malley,[1] | § | |
| Commissioner of the | § | |
| Social Security Administration, | § | |
| *Defendant.* | § | |

## MEMORANDUM AND ORDER

Melissa Coffee appeals the Social Security Administration Commissioner's final decision denying her application for social security benefits. ECF No. 1. Pending before the court are Plaintiff's Motion for Summary Judgment, ECF No. 12, and Defendant's Motion for Summary Judgment and Brief in Support, ECF Nos. 14, 15. The parties consented to the jurisdiction of the undersigned magistrate judge for all purposes, including entry of judgment. ECF No 23. The Commissioner's final decision is **AFFIRMED**.

### *1. Procedural Posture*

Coffee applied for social security benefits under Title II of the Social Security Act on January 3, 2020. Tr. 62, 72. Coffee alleged a disability onset date of December 29, 2018, and alleged impairments of pseudotumor cerebri, intractable migraine, chronic migraine, lumbago with sciatica, hand tremors, stroke, anxiety,

---

[1] Kilolo Kijakazi was the Acting Commissioner of the Social Security Administration (SSA) when Melissa Coffee filed this case but no longer holds that office. Martin O'Malley is Commissioner of the SSA and is automatically substituted as a party under Federal Rule of Civil Procedure 25(d).

depression, cervical degenerative disc disease, occipital neuralgia, and low vision. Tr. 55–56, 63–64. The Social Security Administration (SSA) denied Coffee's application initially on August 28, 2020, and upon reconsideration on October 19, 2020. Tr. 61, 62, 70, 72.

At Coffee's request, Administrative Law Judge (ALJ) Jana Kinkade held a telephonic hearing on June 3, 2021. Tr. 35–54. At the hearing, the ALJ heard testimony from Coffee and a vocational expert (VE). Tr. 36. Coffee's counsel was present and had the opportunity to examine the witnesses. Tr. 43, 53.

Coffee testified that she graduated from high school and obtained a certificate in dental assistance. Tr. 40. Coffee testified that she worked for several years as a dental assistant but had to stop working because of her health problems. Tr. 43.

Coffee explained that she "was having a lot of procedures done" and could not work because, for example, she would lose her vision when hunched over patients. Tr. 43. The vision loss, Coffee explained, was caused by cranial pressure that caused her optic nerves to swell. Tr. 45. The swelling, Coffee said, resulted in permanent damage and will eventually lead to blindness. *Id.*

Coffee testified that she experienced headaches twice per day with two to three "really bad ones" per week. Tr. 44. She explained that, during the really bad headaches, she could not talk or understand others speaking to her and must sit or lie down in a dark room. *Id.* Coffee testified that she received several spinal taps which only provided temporary relief for her headaches. Tr. 45. Coffee stated that she would lose her vision at least twice per week for five to ten minutes. *Id.* She would attempt to reduce the cranial pressure by taking additional medication or lying in a bathtub with cold water. *Id.*

Coffee testified that she experienced back pain. Tr. 45–46. Coffee explained that she received several injections and that they

helped for only about a week. Tr. 46. Coffee stated that, because of her back pain, she could only sit for twenty to thirty minutes and stand or walk for five minutes. *Id.* If walking for more than five minutes, Coffee would experience muscle spasms and numbness. *Id.* Medication for her muscle spasms worsened her headaches or caused her to feel sleepy. Tr. 47.

Coffee testified that she had poor peripheral vision, which prevented her from driving at night or on highways. Tr. 47. Coffee stated that she had difficulty viewing phone, computer, and television screens and that the flickering of the screen caused "sharp spasm[s]" in her eyes. *Id.*

Coffee testified that she had experienced worsening tremors in both hands since 2013. Tr. 48. Coffee explained that the tremors occur when she is still and that, in her last year of work as a dental assistant, she was not permitted to assist the dentist because she could not hold the instruments. *Id.* Coffee underwent several Botox injections for the tremors, but they did not help. Tr. 49. Finally, Coffee stated that she took Lorazepam twice per week and Quetiapine once daily for anxiety and depression. *Id.*

The ALJ asked the VE to consider a person of Coffee's age and education with the following limitations:

> sedentary exertional level [work] as that term is defined in the regulations. Pushing and/or pulling would be limited to occasional. The person could occasionally climb ramps and stairs but could never climb ladders, ropes, or scaffolds. The person could occasionally balance, stoop, kneel, crouch and crawl. Handling and fingering would be limited to frequent. The person would need to avoid exposure to extremes of heat, hazards such as unprotected heights and unguarded moving machinery. The person would be restricted from operation of a motor vehicle and heavy equipment. The person would be limited mentally to performing simple, routine tasks and simple decision making in an environment that involves few if any

3

> work place changes[.] [I]nteraction with supervisors, coworkers[,] and the public would be limited to occasional.

Tr. 51–52. The VE opined that such an individual could not perform Coffee's past work but could perform unskilled work at the sedentary exertional level such as print inspector, lens inspector, and button inspector. Tr. 52.

The ALJ issued her decision on July 21, 2021, finding that Coffee was not disabled from December 29, 2018, through the decision date. Tr. 13. Coffee requested review of the ALJ's decision, which the Appeals Council denied on November 12, 2021. Tr. 1–6. Coffee timely filed a complaint and an application to proceed in forma pauperis in federal court on January 14, 2022. *See Coffee v. Kijakazi*, 4:22-mc-00103, ECF No. 1 (S.D. Tex. Jan. 14, 2022).

### 2. *Legal Standards*

The Social Security Act provides disability insurance benefits to individuals with physical and mental disabilities who have contributed to the program and were disabled "on or before the date . . . last insured." *See* 42 U.S.C. § 423; *Schofield v. Saul*, 950 F.3d 315, 319 (5th Cir. 2020). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A).

The Commissioner uses a sequential, five-step approach to determine whether the claimant is disabled. *See Schofield v. Saul*, 950 F.3d 315, 317 (5th Cir. 2020); 20 C.F.R. § 404.1520(a)(4) (2020). The claimant bears the burden of proof on the first four steps, and the Commissioner bears the burden on the fifth step. *See Keel v. Saul*, 986 F.3d 551, 555 (5th Cir. 2021). A finding that the claimant is disabled or not disabled at any point in the five-

step review terminates the analysis. 20 C.F.R. § 404.1520(a)(4)
(2020).

This court's review of the ALJ's disability determination is
"highly deferential," and the court asks "only whether substantial
evidence supports the decision and whether the correct legal
standards were employed." *Garcia v. Berryhill*, 880 F.3d 700, 704
(5th Cir. 2018) (citations omitted). "A decision is supported by
substantial evidence if 'credible evidentiary choices or medical
findings support the decision.'" *Salmond v. Berryhill*, 892 F.3d 812,
817 (5th Cir. 2018) (quoting *Whitehead v. Colvin*, 820 F.3d 776, 779
(5th Cir. 2016)). "Substantial evidence is 'more than a mere
scintilla but less than a preponderance.'" *Id.* (quoting *Williams v.
Admin. Rev. Bd.*, 376 F.3d 471, 476 (5th Cir. 2004)). "It means—
and means only—'such relevant evidence as a reasonable mind
might accept as adequate to support a conclusion.'" *Biestek v.
Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consol. Edison Co.
of N.Y. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). The reviewing court
must scrutinize the record to determine whether substantial
evidence supports the ALJ's decision but may not reweigh the
evidence or substitute its judgment. *See Perez v. Barnhart*, 415
F.3d 457, 461 (5th Cir. 2005).

### 3. Analysis

#### A. Step One

At step one, the ALJ must determine whether the claimant
is engaged in substantial gainful activity. 20 C.F.R.
§ 404.1520(a)(4)(i) (2020). A person engaged in substantial gainful
activity is not disabled, regardless of her medical condition, age,
education, or work experience. 20 C.F.R. § 404.1520(b) (2020).

The ALJ found that Coffee had not engaged in substantial
gainful activity since December 29, 2018, the alleged onset date.
Tr. 14. This finding is not in dispute.

## B. *Step Two*

At step two, the ALJ determines whether any of the claimant's impairments or any combination thereof is severe and has lasted or is expected to last a continuous period of at least twelve months. 20 C.F.R. § 404.1520(a)(4)(ii) (2020) (citing 20 C.F.R. § 404.1509). An impairment is severe if it "significantly limits [the claimant's] physical or mental ability to do basic work activities[.]" 20 C.F.R. § 404.1520(c) (2020). "[A]n impairment is not severe 'only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience.'" *Johnson v. Colvin*, 595 F. App'x 443 (5th Cir. 2015) (quoting *Stone v. Heckler*, 752 F.2d 1099 (5th Cir. 1985)). "A person who does not have a 'severe impairment' is not disabled." *Schofield*, 950 F.3d at 318 (citing 20 C.F.R. § 404.1520(c)).

The ALJ found that Coffee had severe impairments of "degenerative disc disease of the lumbar spine, history of knee surgery, hypertension, obesity, pseudo-tumor cerebri/idiopathic intracranial hypertension, migraines, hand tremor, depression, and anxiety." Tr. 14, 22. The ALJ found that Hernandez's non-severe impairments included history of deep venous thrombosis, history of stroke, history of pituitary tumor, and history of occipital neuralgia. Tr. 22. The ALJ explained that, because of a lack of documentation, the record did not support finding those impairments to be medically determinable impairments or impairments that restricted Coffee's daily activities more than minimally. *Id.* The ALJ nonetheless considered those impairments in determining Coffee's residual functional capacity. *Id.* These findings are supported by substantial evidence and are not in dispute.

### C. Step Three

At step three, the ALJ determines if any of the claimant's severe impairments meets or equals a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Listing). 20 C.F.R. § 404.1520(a)(4)(iii) (2020); *see also* 20 C.F.R. Part 404, Subpt. P, App. 1 (2020). The Listing describes impairments that the SSA considers "severe enough to prevent an individual from doing any gainful activity, regardless of . . . age, education, or work experience." 20 C.F.R. § 404.1525(a) (2020). If all the criteria of a Listing section are met or equaled, the claimant is considered disabled. 20 C.F.R. § 404.1520(d) (2020); *Whitehead*, 820 F.3d at 780–81. The claimant has the burden of establishing that an impairment meets or equals the specified medical criteria. *Id.*

The ALJ found that Coffee did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment in the Listing. Tr. 22–24.

The ALJ considered several Listing sections relevant to Coffee's impairments, including Listing section 1.15 (disorders of the skeletal spine resulting in compromise of a nerve root) and section 1.18 (abnormality of a major joint in any extremity), which were added to the Listing between Coffee's application date and the ALJ's decision date. The ALJ also considered Listing section 11.04 (vascular insult to the brain) and 12.06 (anxiety and obsessive-compulsive disorders). Tr. 22–24.

The ALJ found that Coffee did not satisfy Listing section 1.15 (disorders of the skeletal spine resulting in compromise of a nerve root) because magnetic resonance imaging of the lumbar spine did not show evidence of nerve root compression and Coffee had a normal gait and did not require the use of an assistive mobility device. Tr. 22–23 (citing Tr. 394–95); *see also* Tr. 500, 505, 510 (stating that imaging did not show "clear nerve root impingement"); Tr. 382, 387, 416, 442, 473, 494 (finding no gait

abnormality or disturbances); *cf.* Listing § 1.15 (2021) (requiring, among other things: (1) nerve root irritation, tension, or compression; (2) imaging consistent with compromise of a nerve root; and (3) a documented medical need for an assistive mobility device).

The ALJ found that Coffee did not satisfy Listing section 1.18 (abnormality of a major joint in any extremity) because she had a normal gait, did not require an assistive device, and imaging did not show any anatomical abnormality such as joint space narrowing or bony destruction. Tr. 23; *cf.* Listing § 1.18 (2021) (requiring, among other things, a documented medical need for an assistive mobility device and physical examination or imaging noting an anatomical abnormality).

The ALJ found that Coffee did not satisfy Listing section 11.04 (vascular insult to the brain) because she has not experienced disorganization of motor function in two extremities resulting in an extreme limitation. Tr. 23; *see also* Tr. 382, 384, 391, 416, 417, 428, 429, 442, 443, 463, 473, 474, 557, 558, 581, 610, 616, 674 (finding no gait abnormality or disturbances, "normal" reflexes, and "5/5" motor strength); *cf.* Listing § 11.04 (2020) (requiring, among other things, ineffective communication or disorganization of motor function in two extremities, resulting in an extreme limitation in the ability to stand up from a seated position, balance while standing or walking or use the upper extremities).

Listing section 12.06 (anxiety and obsessive-compulsive disorders) sets forth its criteria in paragraphs A, B, and C. Listing §§ 12.00(A)(2), 12.06 (2020). To be found disabled at this step, a claimant's mental disorder must satisfy the requirements of both paragraphs A and B, or both paragraphs A and C. *Id.* Thus, a claimant who does not satisfy either of paragraphs B or C does not meet section 12.06.

8

The paragraph B criteria relate to four broad areas of mental functioning a person uses in a work setting. Listing § 12.00(A)(2)(b) (2020). Those four areas are the applicant's ability to (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself. *Id.* The ALJ must evaluate the claimant's ability to function using this rating scale:

1. No limitation (or none). [Claimant is] able to function in this area independently, appropriately, effectively, and on a sustained basis.

2. Mild limitation. [Claimant's] functioning in this area independently, appropriately, effectively, and on a sustained basis is slightly limited.

3. Moderate limitation. [Claimant's] functioning in this area independently, appropriately, effectively, and on a sustained basis is fair.

4. Marked limitation. [Claimant's] functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited.

5. Extreme limitation. [Claimant is] not able to function in this area independently, appropriately, effectively, and on a sustained basis.

Listing § 12.00(F)(2) (2020). To meet the paragraph B criteria, a claimant's disorder must result in an "extreme" limitation in one, or a "marked" limitation in two of the four areas of mental functioning. *Id.* The ALJ found that Coffee had only moderate or mild limitations in each of the four areas. Tr. 23–24.

As for understanding, remembering, or applying information, the ALJ cited Coffee's function report, wherein she stated that she found it easier to follow written instructions rather than oral instructions. Tr. 23 (citing Tr. 192–99). The ALJ concluded that Coffee had a moderate limitation in this functional area. Tr. 23.

As for interacting with others, the ALJ considered Coffee's statements that she regularly went to medical appointments and played games and watched television with others. Tr. 23–24 (citing Tr. 192–99). Coffee also stated that she "g[ot] along just fine with others" and had never been fired from a job because of problems getting along with others. Tr. 198. The ALJ concluded that Coffee had a moderate limitation in this area. Tr. 23.

As for concentrating, persisting, or maintaining pace, the ALJ considered that Coffee's mental status examinations from numerous providers had been within normal limits. Tr. 24 (citing Tr. 399–402, 474–76, 494, 633–34). The ALJ concluded that Coffee had a moderate limitation in this functional area. Tr. 24.

As for adapting or managing oneself, the ALJ considered Coffee's statement that she could attend to her personal care independently and did not need reminders to attend to her personal needs and grooming. Tr. 24 (citing Tr. 192–99). Coffee stated that she prepared her own meals, performed household chores, shopped online and in stores, and handled her own finances. Tr. 193–95. The ALJ concluded that Coffee had a mild limitation in this functional area. Tr. 24.

Finding no extreme or marked limitations in any functional area, the ALJ concluded that Coffee did not satisfy the paragraph B criteria. Tr. 24.

The ALJ considered the paragraph C criteria. To satisfy paragraph C, the claimant must prove her mental disorders are serious and persistent. The criteria require a medically documented history of the disorder over a period of at least two years and evidence of both (1) medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of her mental disorder, and (2) marginal adjustment, *i.e.*, minimal capacity to adapt to changes in her environment or to demands not

already part of her daily life. Listing §§ 12.00(G)(2)(b)–(c), 12.06 (2020). The ALJ concluded that there was no evidence to support the existence of the paragraph C criteria. Tr. 24.

The ALJ's step three determination is supported by substantial evidence. These findings are not in dispute.

### D. Residual Functional Capacity

Before reaching the final two steps, the ALJ must assess the claimant's residual functional capacity (RFC). 20 C.F.R. § 404.1520(e) (2020) (citing 20 C.F.R. § 404.1545). The RFC is a determination of the most a claimant can do despite all physical and mental limitations. *Perez*, 415 F.3d at 461–62 (citing 20 C.F.R. § 404.1545(a)(1)); SSR 96–8p, 1996 WL 374184, at *2, 4 (July 2, 1996). The RFC determination is "based on all the relevant medical and other evidence in [the] case record[.]" 20 C.F.R. § 404.1520(e) (2020); *Perez*, 415 F.3d at 461–62 (citing 20 C.F.R. § 404.1545(a)(1)); SSR 96–8p, 1996 WL 374184, at *2, 3, 5 (July 2, 1996). The ALJ is responsible for assessing a claimant's RFC. 20 C.F.R. § 404.1546(c) (2020); *Taylor v. Astrue,* 706 F.3d 600, 602–03 (5th Cir. 2012) ("[T]he determination of residual functional capacity is the sole responsibility of the ALJ.").

The ALJ determined that Coffee had the RFC to perform work at the sedentary exertional level with the following limitations:

> [P]ushing and pulling is limited to occasional. The claimant may occasionally climb ramps and stairs and never climb ladders, ropes, or scaffolds. The claimant may occasionally balance, stoop, kneel, crouch, and crawl. The claimant is limited to frequent handling and fingering. The claimant must avoid exposure to extremes of heat and to hazards such as unprotected heights and unguarded moving machinery. The claimant cannot have a job that requires operation of a motor vehicle or heavy equipment. Mentally, the claimant is limited to performing simple, routine tasks

> and simple decision-making in an environment that
> involves few, if any, workplace changes. The claimant
> is limited to occasional interaction with supervisors,
> coworkers, and the public.

Tr. 24.

The ALJ first considered Coffee's symptoms and the extent to which the symptoms were consistent with the objective medical evidence and other record evidence. Tr. 25. The ALJ considered Coffee's allegations that her impairments made it very difficult for her to work and eventually forced her to stop working. *Id*. The ALJ considered details such as that Coffee: could not be hunched over patients or under bright lights at work; experienced several headaches daily and several severe headaches weekly that required her to lie in bed all day or in a cold-water bathtub; and experienced worsening hand tremors since 2013. *Id*. (discussing Coffee's hearing testimony); *see also* Tr. 43, 44, 45, 48 (Coffee's hearing testimony). The ALJ concluded that the limiting effects alleged by Coffee were not entirely consistent with the objective medical and other evidence in the record, discussed next. Tr. 25.

The ALJ reviewed various imaging records revealing no acute intracranial abnormality or enhancement in Coffee's brain and mild bilateral peroneal neuropathy in Coffee's lower extremities. Tr. 26 (citing 394–95, 399–402). As for Coffee's spine, imaging revealed: (1) a broad 3 mm central protrusion at L2-3 resulting in moderate to severe central stenosis without clear nerve root impingement or significant foraminal narrowing; (2) left convex thoracolumbar scoliosis without acute fracture and no cord impingement; and (3) multilevel scattered facet effusions and mild facet degeneration. *Id*. (citing Tr. 498–500).

The ALJ considered September 2019 medical records indicating that Coffee complained of headaches behind both eyes, dizziness, ringing in the ears, and loss of vision. Tr. 26 (citing

Tr. 412–18). The ALJ considered Coffee's statement that pain medication was not helpful, that lumbar punctures provided about ten minutes of relief, and that she underwent at least fifteen Botox injections and tried hydrocodone, tramadol, and over-the-counter medications. *Id.* The ALJ observed that Coffee reported her pain level to be an eight out of ten. *Id.* However, the records reveal that Coffee's provider observed no gait disturbances, "5/5 motor in all muscle groups . . . [and] in all [four] extremities[,]" "intact" sensation, and "normal" reflexes. Tr. 416–17.

The ALJ cited Coffee's function report, wherein she stated she could attend to her personal care, prepare meals and perform household chores, shop, mange her finances, and spend time watching television, reading, or with others. Tr. 26 (citing Tr. 192–99, 208–16). The ALJ considered Coffee's claim in her function report that she needed a walker, but the ALJ determined that she had never been prescribed a walker or a cane and that many of her medical records revealed that Coffee had a normal gait with no sensory or motor deficits. Tr. 26 (citing Tr. 633–34; *see also* Tr. 382, 384, 391, 416, 417, 428, 429, 442, 443, 463, 473, 474, 557, 558, 674.

The ALJ considered the administrative findings made by the state agency medical consultants. Tr. 27. The ALJ determined that the consultants miscalculated Coffee's date last insured and did not assess the full record of medical evidence. *Id.* (citing Tr. 55–61, 63–71, 165–66). The ALJ thus found the state agency medical consultants' assessments to be unpersuasive. *Id.*

The ALJ considered and cited records from Coffee's primary care provider, Charles Kasbarian, M.D., and neurosurgeon Michael Oh, M.D. Tr. 27 (citing Tr. 466–70, 474).

On January 3, 2020, Dr. Kasbarian completed a "Physical Residual Functional Capacity Questionnaire" opining on Coffee's RFC. Tr. 466–87. As summarized in the ALJ's decision, Dr.

Kasbarian stated that Coffee "frequently experience[d] pain or other symptoms severe enough to interfere with attention and concentration needed to perform even simple work tasks[;]" limited Coffee to sitting, standing, and walking less than two hours in an eight-hour workday; stated that Coffee could never lift any weight and could never twist, stoop, crouch, or climb ladders or stairs; and stated that Coffee would be absent from work for more than four days per month. Tr. 27 (citing Tr. 466–70). In support of his RFC opinion, Dr. Kasbarian attached various medical records, including those describing his own appointments with Coffee, Tr. 480–83, and those from Coffee's August 2019 appointment with Dr. Oh,[2] Tr. 471–75.

The ALJ noted that Dr. Oh's August 2019 records show a "normal" examination and that Coffee was "alert and oriented[,]" had a "normal" range of motion and no pain, had "5/5 motor strength in all muscle groups tested[,]" and had "intact" sensation to light touch. Tr. 27 (citing Tr. 474). The ALJ did not mention Coffee's subjective complaints or Dr. Oh's statement that "upon my exam, there does appear to be thinning of the left traverse sinus on the MRV. I recommend that she see [Bartley Mitchell, M.D.], my partner who specializes in endovascular neurosurgery, to see if diagnostic angiogram with venogram would be indicated." Tr. 474.

Coffee heeded Dr. Oh's recommendation and saw Dr. Mitchell. Dr. Mitchell's September 2019 records state that Coffee recently underwent a cerebral angiography, and that Dr. Mitchell reviewed the results with Coffee. Tr. 412, 418.  Specifically, Dr.

---

[2] It appears that the ALJ mistakenly attributed Dr. Oh's examination report to Dr. Kasbarian. Dr. Kasbarian had referred Coffee to Dr. Oh, and Dr. Oh provided a report to Dr. Kasbarian, which Dr. Kasbarian attached to his RFC opinion. The ALJ's mistake in thinking that Dr. Kasbarian authored the examination report is harmless. The ALJ accurately interpreted the records and Dr. Kasbarian's RFC opinion is inconsistent with the records he attached to it.

Mitchell "discussed that the pressure measurements . . . did not show a significant gradient, and in this case . . . I would not consider [the gradient to be] a high enough gradient to warrant stenting in the transverse sinus." Tr. 418. Determining that he need not intervene, Dr. Mitchell referred Coffee back to Dr. Oh. *Id.* Dr. Kasbarian completed the RFC questionnaire in January 2020 with Dr. Oh's medical records attached. Tr. 466–87.

The ALJ found Dr. Kasbarian's RFC opinion to be unpersuasive after comparing it to objective medical evidence, including the records attached to Dr. Kasbarian's RFC questionnaire, which showed normal physical and mental examinations. Tr. 27 (citing Tr. 474) (Dr. Oh's August 2019 medical records).

The ALJ considered the May 21, 2021 opinion letter from Coffee's mental health provider, David Alexander, M.D. Tr. 27. The ALJ observed that Dr. Alexander treated Coffee for emotional and behavioral issues since May 7, 2018; diagnosed Coffee with depression and anxiety; stated that Coffee initially responded well to medication; stated that Coffee's vocational, social, and emotional health had been adversely impacted; and stated that Coffee was eligible for and would benefit from disability services. Tr. 27 (citing Tr. 635). The ALJ found Alexander's opinion to be unpersuasive because: (1) Alexander did not "state limitations in vocational terms[;]" and (2) Alexander's opinion on Coffee's eligibility relates to an issue reserved to the commissioner and is therefore inherently neither valuable nor persuasive and need not be considered by the ALJ. Tr. 27; 20 C.F.R. § 414.1520b(c)(3) (2020).

The RFC was determined according to the appropriate legal framework and is supported by substantial evidence.

Coffee argues that the ALJ mischaracterized Dr. Oh's examination as "normal." ECF No. 12 at 6–7. It is true that Dr. Oh

did not use the word "normal"—he said her tests did not show any "significant findings." Tr. 474. Also, he did find a thinning of the left transverse sinus that required follow-up, which is arguably not "normal." *Id.* Any mischaracterization of Dr. Oh's report is harmless. The follow-up that Dr. Oh recommended did not reveal any need for further intervention, however. Tr. 418. Other records of Coffee's appointments with Dr. Kasbarian do not reveal any deficits in Coffee's mental or physical functioning. *See, e.g.,* Tr. 448–50, 480–83. Coffee has not cited any record of an examination by Drs. Oh, Kasbarian, or Mitchell showing a deficit in physical or mental functioning.

Coffee argues that the ALJ "cherry-picked" the evidence by crediting Dr. Oh's August 2019 medical records while ignoring evidence that would not support his conclusions. ECF No. 12 at 7. The court disagrees. The physical and mental examinations documented in Dr. Oh's record are consistent with other objective physical and mental examinations throughout the record. *See, e.g.,* Tr. 382, 384, 391, 416, 417, 428, 429, 442, 443, 463, 473, 474, 557, 558, 581, 610, 616, 674. The cited records all demonstrate that Coffee's medical conditions were not as limiting as Coffee and Dr. Kasbarian suggest. Other than Dr. Kasbarian's RFC questionnaire, which the ALJ properly rejected, Coffee cites no other records that the ALJ purportedly ignored or that support her alleged limitations.

Coffee argues that "The ALJ violated the 5th Circuit Court's holding in *Ripley v. Chater* by rejecting all medical opinions and independently determining the claimant's RFC." ECF No. 12 at 5 (citing *Ripley v. Chater*, 67 F.3d (5th Cir. 1995)). The regulations do not prohibit the ALJ from assessing the claimant's RFC based on other record evidence when the ALJ finds the available medical opinions to be unpersuasive. 20 C.F.R. §§ 404.1545(a)(1), (a)(3), (e) (2020). The regulations place the responsibility upon the ALJ to

16

assess a claimant's RFC "based on all the relevant evidence in [the claimant's] case record." 20 C.F.R. § 404.1545(a)(1) (2020); *see also* 20 C.F.R. § 404.1546(c) (2020). Courts regularly affirm ALJ decisions where all medical opinion evidence has been rejected as unpersuasive. In the absence of medical opinions, courts have found evidence such as MRI and EEG test results, neurophysiological studies, treating physician remarks, physical examinations, and the claimant's own testimony to be substantial evidence to support the ALJ's RFC determination. *See Taylor,* 706 F.3d at 603 (considering MRI and EEG results, neurophysiological studies, and treating physician remarks); *Garza v. Astrue,* Civil No. M-09-133, 2013 WL 2432421, at *15–16 (S.D. Tex. June 3, 2013) (considering physical examinations and general medical evidence); *Gutierrez v. Barnhart,* No. 04-11025, 2005 WL 1994289, at *7 (5th Cir. Aug. 19, 2005) (per curiam and unpublished opinion) (considering the claimant's own testimony).

In *Ripley,* the Fifth Circuit remanded the case because, among other errors, the ALJ found the claimant was capable of sedentary work "even though there was *no medical testimony* supporting this conclusion." 94 F.3d at 557 (emphasis added). The court pointed out that "[t]he absence of such a [medical source] statement . . . does not, in itself, make the record incomplete." *Id.* The court explained that, in the absence of a medical statement, the court focuses on whether the ALJ's decision is supported by substantial evidence in the existing record. *Id.* The court concluded that the ALJ's opinion was not supported by substantial evidence because the record contained "a vast amount of medical evidence" establishing an impairment which the ALJ did not consider in formulating the RFC. *Id.*

Coffee also cites *Williams v. Astrue,* 355 F. App'x 828 (5th Cir. 2009). ECF No. 12 at 6. In *Williams,* the Fifth Circuit remanded because "there was *no medical or other evidence*

supporting the ALJ's [RFC] determination." *Id.* at 831 (emphasis added). The court found that, once the ALJ refused to give controlling weight to certain medical opinions, there was no evidence left to support the ALJ's RFC finding. The court also pointed out that "the ALJ failed to consider [a] physical therapy discharge summary [that] directly contradicts the ALJ's finding." *Id.* The court concluded that, in the face of contradictory evidence and with no evidence supporting the ALJ's RFC finding, the RFC was not supported by substantial evidence. *Id.* at 832. Importantly, the court explained that *Ripley* stood for the proposition that "an ALJ may not rely on his own *unsupported* opinion as to the limitations presented by the [claimant's] medical conditions." *Id.* at 832 n.6 (emphasis added) (citing *Ripley*, 97 F.3d at 557).

This case does not present the same problems as *Ripley* and *Williams* did. Here, the ALJ properly considered the medical opinions in the record and explained why she found them to be unpersuasive. Having rejected all the available opinion evidence, the ALJ considered other evidence in the record. As discussed above, the other evidence in the record supports the ALJ's RFC determination. *See, e.g.*, Tr. 382, 384, 391, 416, 417, 428, 429, 442, 443, 463, 473, 474, 557, 558, 581, 610, 616, 674 (medical records); Tr. 192–99, 208–16 (Coffee's function report). Unlike *Williams* and *Ripley*, the exclusion of the opinions did not leave the RFC finding without support.

Coffee argues that, once she excluded the medical opinions, the ALJ should have engaged a medical expert to perform a consultative examination. ECF No. 12 at 8–9. The court disagrees. "The ALJ has a duty to develop the facts fully and fairly relating to an applicant's claim for disability benefits." *Brown v. Saul*, 858 F. App'x 711, 713 (5th Cir. 2021) (quoting *Boyd v. Apfel*, 239 F.3d 698, 708 (5th Cir. 2001)). When an ALJ makes "an informed decision based on sufficient facts[,]" the ALJ fulfills the duty to

develop the record. *Id.* (quoting *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996)). Reversal of the ALJ's decision is proper only if the claimant shows that "he could and would have adduced evidence that might have altered the result." *Id.* (quoting *Brock*, 84 F.3d at 728). The mere assertion "that additional beneficial evidence might have been gathered . . . is insufficient" to show prejudice. *Jones v. Astrue*, 691 F.3d 730, 735 (5th Cir. 2012). The decision whether a consultative examination is needed is within the ALJ's discretion and is required only if it is necessary to enable the ALJ to make the disability decision. *Brown*, 858 F. App'x at 713. Coffee has not shown that the record evidence was insufficient for the ALJ to make an RFC determination. Nor has Coffee shown that calling another medical expert would have made a difference.

Coffee argues that the ALJ improperly focused on the need for objective evidence and "erred by rejecting . . . [Coffee's testimony] about the severity of her subjective symptoms simply because [the statements were] 'not entirely consistent' with the objective evidence[.]" ECF No. 12 at 10. The ALJ is required to consider Coffee's subjective symptoms in light of the objective medical evidence. *See* 20 C.F.R. § 404.1529(a) (2020) (emphasis added) ("In determining whether [a claimant is] disabled, [the SSA] consider[s] all . . . symptoms, including pain, and the extent to which [the] symptoms can reasonably be accepted as *consistent with the objective medical evidence* and other evidence.").

Here, the ALJ appropriately considered the objective medical evidence when evaluating Coffee's subjective complaints and concluded that Coffee's "statements concerning the intensity, persistence and limiting effects of [her] symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." Tr. 25. The ALJ's decision demonstrates that she did not reject Coffee's subjective complaints but instead accounted for them in determining the RFC. For example, the ALJ limited

Coffee to sedentary work, Tr. 24, which "involves lifting no more than [ten] pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. § 404.1567(a) (2020). The ALJ further restricted Coffee to only occasionally climbing ramps or stairs, occasionally stooping, kneeling, crouching, or crawling, and never climbing ladders, ropes, or scaffolds. Tr. 24.

Coffee next argues that the ALJ improperly determined that she could perform sedentary work. The evidence does not support Coffee's position. Coffee alleged that she could not sit, walk, or stand for long periods of time and that she had difficulty using her hands and fingers. Tr. 46, 48. The only evidence that Coffee cites in support of her allegations is Dr. Kasbarian's RFC questionnaire. ECF No. 12 at 12. But as discussed above, the ALJ properly found Dr. Kasbarian's RFC opinion to be unpersuasive as it was unsupported by the objective medical evidence. As discussed above, the record is replete with evidence that Coffee had normal examinations, normal strength, and normal gait.

In her final argument, Coffee argues that "[v]ery little consideration was given to the triggers of [Coffee's] migraines which can include bright lights, loud noises, stress levels, strong smells, etc." ECF No. 12 at 13–14. The ALJ adequately considered Coffee's migraines. For example, the ALJ limited Coffee to "performing simple, routine tasks and simple decision-making in an environment that involves few, if any, workplace changes." Tr. 24. Coffee was also limited to occasional interaction with others and avoiding exposure to heat and hazards. *Id.*

The ALJ's followed the correct legal rules and based the RFC on substantial evidence. There is no error.

### E. Step Four

At step four, the ALJ determines whether the claimant can perform jobs she previously worked by comparing the RFC

determination with the demands of the claimant's past relevant work. 20 C.F.R. § 404.1520(f) (2020); *see also Perez*, 415 F.3d at 462. If the claimant can perform her past work, she is not disabled. 20 C.F.R. § 404.1520(f) (2020). If the claimant cannot perform her past work, the ALJ proceeds to step five. *See* 20 C.F.R. § 404.1520(g)(1) (2020).

Based on the VE's hearing testimony and Coffee's RFC, the ALJ determined that Coffee could not perform her past work as a dental assistant. Tr. 28. This finding is supported by substantial evidence and is not in dispute.

### F. Step Five

At step five, the ALJ determines whether the claimant can perform any other work by considering the claimant's RFC and other factors, including age, education, and past work experience. *Schofield*, 950 F.3d at 318 (quoting 20 C.F.R. § 404.1520(a)(4)(v)). If the claimant can perform other work available in the national economy, the claimant is not disabled. *Schofield*, 950 F.3d at 318 (citing 20 C.F.R. § 404.1520(g)).

The ALJ found that Coffee could perform jobs that exist in significant numbers in the national economy. Tr. 28–29. The ALJ relied on the VE's testimony that an individual of Coffee's age, education, work experience, and RFC would be able to work as a print inspector, lens inspector, and button inspector. Tr. 29, 52.

Because the VE's testimony was based on the ALJ's hypothetical question that incorporated all the limitations reasonably recognized by the ALJ, and Coffee's attorney had the opportunity to cross-examine the VE, the VE's testimony is substantial evidence supporting the ALJ's step-five determination. *See Masterson v. Barnhart*, 309 F.3d 267, 273–74 (5th Cir. 2002) (holding that the ALJ properly relied on the VE's testimony because the ALJ "scrupulously incorporated" all the limitations "supported by the evidence and recognized by the ALJ" and gave

an opportunity for cross examination). Accordingly, the ALJ's findings at step five are supported by substantial evidence.

### 4. *Conclusion*

The ALJ's decision denying social security benefits is consistent with the law and supported by substantial evidence. There is no genuine issue of material fact, and summary judgment is appropriate. Fed. R. Civ. P. 56(a), (c). Accordingly, Coffee's Motion for Summary Judgment, ECF No. 12, is **DENIED**; the Commissioner's Motion for Summary Judgment, ECF No. 14, is **GRANTED**; and the Commissioner's final decision is **AFFIRMED**.

Signed at Houston, Texas on March 1, 2024.

_____

Peter Bray
United States Magistrate Judge

22